## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**MICHAEL D. BOURGEOIS**

                    **Plaintiff,**

   **vs.**

**ABBVIE, INC.,**

    **and**

**ABBOTT LABORATORIES INC.**

                **Defendants.**

**Case No. _____**

**Jury Trial Demanded**

## COMPLAINT

Plaintiff Michael D. Bourgeois (hereinafter "Plaintiff" or "Bourgeois"), hereby files this Complaint, by and through counsel, against Defendants AbbVie, Inc. and Abbott Laboratories Inc. ("Defendants") and states as follows:

## I.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    INTRODUCTION

1.    This case involves the prescription drug AndroGel, which is manufactured, sold, distributed, and promoted by Defendants AbbVie, Inc. and Abbott Laboratories Inc. (hereinafter jointly "Defendants") as a testosterone replacement therapy.

2.    Defendants misrepresented that AndroGel is a safe and effective treatment for hypogonadism and a condition they have referred to as "low testosterone," when in fact the drug

1

causes serious medical problems, including life threatening cardiac events, strokes, thrombolytic events, and death.

3.      In addition to other physiologic adverse health effects caused by AndroGel, AndroGel causes the hematocrit level to increase, thereby thickening the blood.  This effect, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes, thrombolytic events, and death.

4.      Defendants failed to adequately warn physicians about the risks associated with AndroGel and the monitoring required to ensure their patients' safety.

5.      Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for AndroGel.  Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low T" or "low testosterone."

6.      According to the industry-leading Androgen Deficiency in Adult Males ("ADAM") or "Is it Low T?" quiz, the symptoms of "Low T" include being "sad or grumpy," "experiencing deterioration in the ability to play sports," and "falling asleep after dinner."[1]  In fact, most doctors agree that such symptoms may be caused by an abundance of factors, the most prominent of which is the natural aging process.

7.      As a result of Defendants' aggressive advertising campaigns for AndroGel, diagnoses of "Low T" have increased exponentially.  This surge in diagnoses has directly led to AndroGel's sales increasing to over $1.37 billion per year.

---

[1] *Available at* http://www.isitlowt.com/do-you-have-low-t/low-t-quiz.

8.     However, consumers of AndroGel have been misled by Defendants as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, thrombolytic events, and death.

**B.     PARTIES**

9.     At all times relevant hereto, Plaintiff Michael D. Bourgeois has been a citizen of Abita Springs, Louisiana.

10.     Defendant AbbVie, Inc. is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Lake County, Illinois 60064.

11.     Defendant Abbott Laboratories Inc. is a corporation and existing under the laws of the state of Illinois and maintains its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.

12.     By way of background, Unimed Pharmaceuticals Inc. originally developed AndroGel and sought FDA approval in 1999.  Before the drug was eventually approved by the FDA in 2000, Solvay Pharmaceuticals Inc. acquired Unimed Pharmaceuticals Inc. and subsequently brought AndroGel to market.  In 2010, Defendant Abbott Laboratories Inc. acquired Solvay's pharmaceutical division, which included AndroGel.   In 2013, Defendant Abbott Laboratories Inc. created AbbVie, a company composed of Abbott's former proprietary pharmaceutical business, which included AndroGel.

**C.     JURISDICTION AND VENUE**

13.     The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. Section §1332.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14.     Venue is proper in the U.S. District Court for the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, because, inter alia, Plaintiff was prescribed and applied AndroGel, and suffered multiple severe adverse health events related to the use of AndroGel in St. Tammany Parish Louisiana.

15.     The U.S. District Court for the Eastern District of Louisiana has personal jurisdiction over the Defendants because Defendants transact business in Louisiana and the wrongs complained of herein arose in Louisiana.

16.     This Court has supplemental jurisdiction over any corollary state claims pursuant to 28 U.S.C. § 1367.

### D.     FACTUAL BACKGROUND

### General Allegations

17.     This action for damages is brought by Plaintiff Bourgeois.  Plaintiff was prescribed and supplied with, received, and took and applied the prescription drug AndroGel as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold, or otherwise placed in the stream of interstate commerce by Defendants.

18.     Defendants' wrongful acts, omissions, and fraudulent misrepresentations were the direct and proximate cause of injury to Bourgeois, which includes but is not limited to blood clots, arterial blockage requiring heart stent surgery, increased fluid around lungs and enlarged prostate.

19.     At all times relevant hereto, the Defendants engaged in, or were successors in interest to entities engaged in, the business of research, licensing, designing, formulating,

4

compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising for sale or selling the prescription drug AndroGel for the use and application by men, including, but not limited to, Bourgeois.

20.     At all times relevant hereto, Defendants were authorized to do business within the State of Louisiana.

21.     At all times relevant hereto, Defendants and agents, officers, and directors of Defendants participated in, authorized, and directed the production and promotion of AndroGel when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of AndroGel, and thereby actively participated in the tortious conduct with resulted in the injuries and death suffered by Michael Komrada.

**Overview**

22.     Hypogonadism is a specific and recognized condition of the endocrine system, which in men may involve the severely diminished production or nonproduction of testosterone.

23.     A study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001 – 2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism.[2] For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.[3]

24.     Defendants coordinated a massive advertising campaign designed to convince men that they suffered from low testosterone.  Defendants orchestrated a national disease awareness

---

[2] Jacques Baillargeon, et al., *Trends in androgen prescribing in the United States, 2001 to 2011*, JAMA INTERNAL MEDICINE (Aug. 2013).

[3] *Id.*

media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential AndroGel users, and online media including the website "IsItLowT.com."

25.     The television advertisements for AndroGel have suggested that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all of which are general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

26.     Defendants' national marketing campaign included the creation and continued operation of the website, "www.IsItLowT.com." The website asserts that millions of otherwise healthy men experience low testosterone and encourages male visitors to "Take the 'It is Low T' Quiz." The "Is it Low T" quiz asks men if they have experienced potential signs of low testosterone, including such questions as: "Have you experienced a recent deterioration in your ability to play sports?"; "Are you falling asleep after dinner?"; "Are you sad and/or grumpy?"; and "Do you have a lack of energy?"

27.     Dr. John Morley, director of endocrinology and geriatrics at the St. Louis University School of Medicine, developed this quiz at the behest of Dutch pharmaceutical company Organon BioSciences, in exchange for a $40,000 grant to his university. The pharmaceutical company instructed Dr. Morley, "Don't make it too long and make it somewhat sexy." Dr. Morley drafted the questionnaire in 20 minutes in the bathroom, scribbling the questions on toilet paper and giving them to his secretary the next day to type up. Dr. Morley

6

admits that he has "no trouble calling it a crappy questionnaire" and that it is "not ideal." However, this is the "Low T Quiz" used on the "IsItLowT" website created and operated by Defendants.[4]

28.     Since the FDA approved AndroGel, Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

29.     Defendants have promoted AndroGel as an easy-to-use topical testosterone therapy.   Defendants contrast AndroGel's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

30.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease in using AndroGel.  Although prescription testosterone therapy has been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies as a result of Defendants' AndroGel advertising campaign.

31.     What consumers received, however, were not safe drugs, but a product which causes life-threatening problems, including strokes, heart attacks, pulmonary embolisms, and blood clots, as well as death.

32.     Defendants successfully created a robust and previously nonexistent market for their drug.  Defendant Abbott Laboratories spent $80 million promoting AndroGel in 2012.  The company also spent millions of dollars on its unbranded marketing including television commercials and websites, www.IsItLowT.com and www.DriveForFive.com.  These websites

---

[4] Natasha Singer, *Selling that New-Man Feeling*, N.Y. TIMES (Nov. 23, 2013).

recommend that men have regular checkups with their physicians and undergo five tests: cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

33.     Defendants' advertising campaign paid off in a return of $1.4 billion in sales during the past year, making AndroGel the highest-selling androgen drug in the United States. Sales of replacement therapies have more than doubled since 2006 and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts.[5]

34.     In early 2013, Medical Marketing & Media named two AbbVie executives as "the all-star large pharma marketing team of the year" for promotions of AndroGel and unbranded efforts to advance low T.[6]

35.     Defendants' marketing campaign for AndroGel sought to create an image and engender a belief among consumers and physicians that low testosterone affects an exceedingly large number of men in the United States and that the use of AndroGel is safe for human use, even though Defendants knew this to be false.

36.     A number of studies associate testosterone use in men with an increased risk of heart attack and strokes.

37.     In 2010, a New England Journal of Medicine study entitled "Adverse Events Associated with Testosterone Administration"[7] was discontinued after a notably high number of men in the testosterone group suffered adverse events.

---

[5] Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?*, BLOOMBERG BUSINESSWEEK (May 10, 2012), *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

[6] *See* Singer, *Selling That New-Man Feeling*, *supra*; *see also* Larry Dobrow, *All-star large pharma marketing team of the year: Androgel*, MEDICAL MARKETING & MEDIA (Jan 2, 2013), *available at:* http://www.mmm-online.com/all-star-large-pharma-marketing-team-of-the-year-androgel/article/273242/.

[7] Shehzad Basaria, M.D., et al., *Adverse Events Associated with Testosterone Administration*, THE NEW ENGLAND J. OF MED. (July 8, 2010).

38.     In November 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels,"[8] which indicated that testosterone therapy increased the risk of death, heart attack, and stroke by about 30%.

39.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men,"[9] which indicated that testosterone could double the risk of heart attacks in men over 65 years old and men younger than age 65 with a previous diagnosis of heart disease.

**Factual Allegations Common to All Causes of Action**

40.     The FDA approved AndroGel 1% on February 28, 2000 for the treatment of adult males who have low or no testosterone.  AndroGel 1.62% was more recently approved by the FDA, in April 2011.  After FDA approval of AndroGel 1%, AndroGel was widely advertised and marketed by Defendants as a safe and effective testosterone replacement therapy.

41.     AndroGel is a hydroalcoholic gel containing testosterone in either 1% or 1.62% that users are instructed to apply to their chest, arms, or stomach.  After application, the product enters the body through transdermal absorption.  The AndroGel 1.62% product also contains isopropyl myristate as an ointment and ethanol for absorption enhancement.

42.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

---

[8] Rebecca Vigen, M.D., et al., *Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels*, JAMA (Nov. 6, 2013).

[9] William D. Finkle, et al., *Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men*, PLOS ONE (Jan. 2014).

43.     Testosterone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

44.     In men, testosterone levels normally begin a gradual decline after the age of 30.

45.     The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood.  However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication.  As a result, many men who may have testosterone levels below 300 ng/dl on one day will have normal testosterone levels the next.

46.     AndroGel may produce dangerous side effects in patients who use the drug, including but not limited to myocardial infarction, stroke, pulmonary embolism, and death.

47.     In some patient populations, AndroGel use may increase the incidence of adverse events and death by over 500%.

48.     AndroGel has been linked to several severe and life-changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied AndroGel.  Persons taking AndroGel may experience enlarged prostates and increased serum prostate-specific antigen levels.

49.     Secondary exposure to AndroGel can cause side effects in others.  In 2009, the FDA issued a black box warning for AndroGel prescriptions, advising patients of reported virilization in children who were secondarily exposed to the gel.  Testosterone may also cause physical changes in women exposed to AndroGel and cause fetal damage in pregnant women who come into secondary contact with the drug.

50.     Since 2000, Defendants have employed a strategy to aggressively market and sell AndroGel by misleading potential users about the prevalence and symptoms of low testosterone,

thus failing to protect users from serious dangers that Defendants knew or should have known to result from use of AndroGel.

51.     Defendants marketed AndroGel by undertaking a "disease awareness" marketing campaign.  This campaign sought to create a perception among consumers that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy, were actually attributable to "Low T."

52.     Defendants' advertising campaign sought to create the belief in consumers and their physicians that use of AndroGel was a safe method of alleviating their symptoms, had few side effects, and would not interfere with their daily lives, even though Defendants knew or should have known these claims to be false and had no reasonable grounds to believe them to be true.

53.     Defendants purposefully downplayed, understated, and ignored the health hazards and risks associated with using AndroGel.  Defendants deceived potential AndroGel users by relaying positive information about AndroGel through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence while downplaying known adverse and serious health risks.

54.     Defendants concealed material relevant information from potential AndroGel users and minimized user and prescriber concern regarding the safety of AndroGel.

55.     In the warnings related to AndroGel that Defendants have provided in their television, online, and print advertisements, Defendants have failed to mention any potential risk of cardiac event, stroke, pulmonary embolism, or other dangerous side effects related to blood clotting.

56.     In the warnings related to AndroGel that Defendants have provided in their television, online, and print advertisements, Defendants falsely represent that AndroGel was tested for all likely side effects.

57.     In the warnings related to AndroGel that Defendants have provided in their television, online, and print advertisements, Defendants fail to provide warning or instruction regarding the importance of adequate monitoring of hematocrit levels in AndroGel users.

58.     As a result of Defendants' advertising, marketing, and representations about AndroGel, men throughout the United States pervasively seek out prescriptions for AndroGel.

**Factual Allegations Specific to the Instant Action**

59.     Plaintiff was 59 yeards old when he was prescribed and used AndroGel for symptoms he attributed to low testosterone as a result of Defendants' advertisements in 2010. Bourgeois received a prescription for AndroGel and subsequently had the prescription filled on Several occasions in the summer and fall of 2010.  Bourgeois began using AndroGel on or about July 2, 2010.

60.     Plaintiff took AndroGel as directed without any knowledge of the significantly increased risk of serious cardiovascular injury associated with use of the product.  Indeed, during that time, AndroGel contained no warning that cardiovascular risks were associated with use of the product.

61.     As a direct and proximate result of the negligence, carelessness, and other wrongdoing of Defendants, as described herein, Plaintiff developed blood clots, fluid around his lungs, and required heart stent surgery on or about October 10, 2010, due to arterial blockage and heart failure caused by AndroGel.

62.     Prior to using AndroGel, Plaintiff had no history of blood clots or significant cardiovascular problems.

63.     Prior to Plaintiff's use of AndroGel, Defendants knew or should have known that the original labeling of the product did not adequately warn Bourgeois and his physicians of the risks associated with using AndroGel as described above.

64.     Prior to Plaintiff's use of AndroGel, Defendants knew or should have known the defective nature of AndroGel and that persons who were prescribed and used AndroGel for even a brief period of time, including Bourgeois, were at an increased risk of serious health complications such as myocardial infarction, stroke, blood clots, and death.  Defendants, through their affirmative misrepresentations and omissions, concealed from Plaintiff and his physicians the true and significant risks associated with AndroGel use.

65.     Bourgeois was unaware of the increased risk for developing life-threatening injuries due to AndroGel use.  Had Bourgeois known the true risks associated with the use of testosterone medications, including AndroGel, he would not have used AndroGel and would not have suffered injury as a result of his use of AndroGel.

66.     As a direct and proximate result of the negligence, carelessness, and other wrongdoing of Defendants, as described herein, Plaintiff suffered severe injuries, including pain and suffering, and ongoing and future medical care needs.

67.     As a direct and proximate result of the negligence, carelessness, and other wrongdoing of Defendants, as described herein, Plaintiff suffered severe mental and physical pain and suffering, emotional distress and severe injuries, and economic loss due to necessary medical expenses, living-related expenses, lost wages, and loss of earning capacity.

## II.     FEDERAL REQUIREMENTS

13

68.     Defendants had an obligation to comply with the law in the manufacture, design, and sale of AndroGel.

69.     Upon information and belief, Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq*.

70.     With respect to the testosterone replacement drug AndroGel, Defendants, upon information and belief, has or may have failed to comply with all federal standards applicable to the sale of prescription drugs, including, but not limited to, one or more of the following violations:

   a.  The prescription drug AndroGel is adulterated pursuant to 21 U.S.C.

       § 351 because, among other things, it fails to meet established performance standards, and/or the methods, facilities, or controls used for its manufacture, packing, storage or installation is not in conformity with federal requirements. See, 21 U.S.C. § 351.

   b.  The prescription drug AndroGel is adulterated pursuant to 21 U.S.C.

       § 351 because, among other things, its strength differs from, or its quality or purity falls below, the standard set forth in the official compendium for AndroGel, and such deviations are not plainly stated on its labels.

   c.  The prescription drug AndroGel is misbranded pursuant to 21 U.S.C.

       §352 because, among other things, it's labeling is false or misleading.

   d.  The prescription drug AndroGel is misbranded pursuant to 21 U.S.C.

       §352 because words, statements, or other information required by or under

14

authority of chapter 21 U.S.C. §352 are not prominently placed thereon with such conspicuousness and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

e.  The prescription drug AndroGel is misbranded pursuant to 21 U.S.C.

§352 because the labeling does not (i) bear adequate directions for use, and/or (ii) bear adequate warnings against use where its use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as are necessary for the protection of users.

f.  The prescription drug AndroGel is misbranded pursuant to 21 U.S.C.

§352 because it's dangerous to health when used in the dosage, manner, or with the frequency or duration prescribed, recommended,

or suggested in the labeling thereof.

g.   The prescription drug AndroGel does not contain adequate directions for use pursuant to 21 CFR §201.5, because, among other reasons, of omission, in whole or in part, or incorrect specification of:

(1) statements of all conditions, purposes, or uses for which it is intended, including conditions, purposes, or uses for which it is prescribed, recommended or suggested in its oral, written, printed, or graphic advertising, and conditions, purposes, or uses for which the drugs are commonly used;

(2) quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and

different physical conditions;

    (3) frequency of administration or application;

    (4) duration or administration or application; and/or

    (5) route or method of administration or application.

h. Defendants violated 21 CFR §201.56 because the labeling was not informative and accurate.

i. The prescription drug AndroGel is misbranded pursuant to 21 CFR §201.56 because the labeling was not updated as new information became available that caused the labeling to become inaccurate, false, or misleading.

j. Defendants violated 21 CFR §201.57 by failing to provide information that is important to the safe and effective use of the drug, including the potential of Testim to cause cardiovascular disease and the need for regular and consistent monitoring to ensure that a potentially fatal cardiac condition has not developed.

k. Defendants violated 21 CFR §201.57 because they failed to identify specific tests needed for selection or monitoring of patients who took the prescription drug AndroGel.

l. Defendants violated 21 CFR §201.57 because the safety considerations regarding the prescription drug AndroGel are such that the drug should be reserved for certain situations, and the Defendants failed to state such information.

m. The prescription drug AndroGel is mislabeled pursuant to 21 CFR §201.57 because the labeling fails to describe serious adverse reactions and potential safety hazards, limitations in use imposed by it, and steps that should be

taken if they occur.

n.  The prescription drug AndroGel is mislabeled pursuant to 21 CFR

§201.57 because the labeling was not revised to include a warning as soon as there

was reasonable evidence of an association of a serious

hazard with the drug.

o.  Defendants violated 21 CFR §201.57 because the labeling failed to list the adverse

reactions that occur with the prescription drug AndroGel and other drugs in the

same pharmacologically active and chemically related class.

p.  Defendants violated 21 CFR §201.57 because the possibility that a patient

could develop cardiovascular disease and other adverse reactions significantly

more severe than the other reactions listed in the adverse reactions, and yet

Defendants failed to list the development of same before the other adverse reactions

on the labeling of the prescription drug AndroGel.

q.  The prescription drug AndroGel is mislabeled pursuant to 21 CFR

§201.57 because the labeling does not state the recommended usual dose, the

usual dosage range, and, if appropriate, an upper limit beyond which safety and

effectiveness have not been established.

r.  The prescription drug AndroGel violates 21 CFR §210.1 because the process by

which it was manufactured, processed, and/or held fails to meet the minimum

current good manufacturing practice of methods to be used in, and the facilities

and controls to be used for, the manufacture, packing, or holding of a drug to

assure that it meets the requirements as to safety and meets the quality and

purity characteristics that it purports or is represented to possess.

s. The prescription drug AndroGel violates 21 CFR §210.122 because the labeling and packaging materials do not meet the appropriate specifications.

t.  The prescription drug AndroGel violates 21 CFR §211.165 because the test methods employed by Defendants are not accurate, sensitive, specific, and/or reproducible and/or such accuracy, sensitivity, specificity, and/or reproducibility of test methods have not been properly established and documented.

u.  The prescription drug AndroGel violates 21 CFR §211.165 in that the prescription drug ANDROGEL fails to meet established standards or specifications and any other relevant quality control criteria.

v.  The prescription drug AndroGel violates 21 CFR §211.198 because the written procedures describing the handling of all written and oral complaints regarding the prescription drug AndroGel were not followed.

w.  The prescription drug AndroGel violates 21 CFR §310.303 in that the prescription drug AndroGel is not safe and effective for its intended use.

x.  The Defendants violated 21 CFR §310.303 because Defendants failed to establish and maintain records and make reports related to clinical experience or other data or information necessary to make or facilitate a determination of whether there are or may be grounds for suspending or withdrawing approval of the application to the FDA.

y.  Defendants violated 21 CFR §§310.305 and 314.80 by failing to report adverse events associated with the prescription drug AndroGel as soon as possible or at least within 15 days of the initial receipt by the Defendants of the adverse drugs

experience.

z.  Defendants violated 21 CFR §§310.305 and 314.80 by failing to conduct an investigation of each adverse event associated with the prescription drug AndroGel, and evaluating the cause of the adverse event.

aa. Defendants violated 21 CFR §§310.305 and 314.80 by failing to promptly investigate all serious, unexpected adverse drug experiences and submit follow-up reports within the prescribed 15 calendar days of receipt of new information or as requested by the FDA.

bb. Defendants violated 21 CFR §§310.305 and 314.80 by failing to keep records of the unsuccessful steps taken to seek additional formation regarding serious, unexpected adverse drug experiences.

cc. Defendants violated 21 CFR §§310.305 and 314.80 by failing to identify the reports they submitted properly, such as by labeling them as "15-day Alert report," or "15-day Alert report follow-up."

dd. Defendants violated 21 CFR §312.32 because they failed to review all information relevant to the safety of the prescription drug AndroGel or otherwise received by the Defendants from sources, foreign or domestic, including information derived from any clinical or epidemiological investigations, animal investigations, commercial marketing experience, reports in the scientific literature, and unpublished scientific papers, as well as reports from foreign regulatory authorities that have not already been previously reported to the agency by the sponsor.

ee. Defendants violated 21 CFR §314.80 by failing to provide periodic reports to

19

the FDA containing

(1) a narrative summary and analysis of the information in the report and an analysis of the 15-day Alert reports submitted during the reporting interval,

(2) an Adverse Reaction Report for each adverse drug experience not already reported under the Post marketing 15-day Alert report, and/or

(3) a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated).

ff.  Defendants violated 21 CFR §314.80 by failing to submit a copy of the published article from scientific or medical journals along with one or more 15-day Alert reports based on information from the scientific literature.

71.    Defendants failed to meet the standard of care set by the above statutes and regulations, which were intended for the benefit of individual consumers such as Bourgeois, making Defendants liable under Louisiana law.


**III.    CAUSES OF ACTION**

**A. FIRST CAUSE OF ACTION: <u>Construction or Composition Defect under La. R.S. 9:2800.55</u>**

72.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if stated herein.

73.    At all times material to this action, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling AndroGel.

74.    At all times material to this action, AndroGel was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Bourgeois, without substantial change in the condition in which it was sold.

75.    At all times material to this action, AndroGel was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

      a.  When placed in the stream of commerce, AndroGel contained manufacturing defects which rendered the subject product unreasonably dangerous;

      b.  The subject product's manufacturing defects occurred while the product was in the possession and control of Defendants;

      c.  The subject product was not made in accordance with Defendants' specifications or performance standards; and

      d.  The subject product's manufacturing defects existed before it left the control of Defendants.

76.    The subject product manufactured and/or supplied by Defendants was defective in construction or composition in that, when it left Defendants' hands, it deviated in a material way from Defendants' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula. In particular, the product is not safe, has numerous and serious side effects, and causes severe and permanent injuries including, but not limited to, developing cardiovascular disease, strokes, and myocardial infarctions. The

product was unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

**B.     SECOND CAUSE OF ACTION: <u>Design Defect under La. R.S. 9:280</u>**

77.     Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if stated herein.

78.     AndroGel is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. The subject product was unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

79.     At all times material to this action, AndroGel was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Bourgeois, without substantial change in the condition in which it was sold.

80.     At all times material to this action, AndroGel was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a. When placed in the stream of commerce, AndroGel contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Bourgeois to risks that exceeded the benefits of the subject product, including, but not limited to, permanent personal injuries including, but not limited to, developing cardiovascular disease, strokes, myocardial infarctions, and other serious injuries and side effects;

22

b.  When placed in the stream of commerce, AndroGel was defective in design and formulation, making the use of AndroGel more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with the other medications and similar drugs on the market to treat low testosterone;

c.  The design defects of AndroGel existed before it left the control of Defendants;

d.  AndroGel was insufficiently tested;

e.  AndroGel caused harmful side effects that outweighed any potential utility; and

f.  AndroGel was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including Bourgeois, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Defendants liable to Plaintiff.

81.    In addition, at the time the subject product left the control of Defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Bourgeois' injuries without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible and would have prevented or significantly reduced the risk of Bourgeois' injuries without substantially impairing the product's utility.

**C.    THIRD CAUSE OF ACTION: <u>Inadequate Warning under La. R.S. 9:2800.57</u>**

82.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if stated herein.

83.    AndroGel was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert consumers, including Bourgeois, of the dangerous risks and reactions associated with the subject product, including but not limited to its propensity to permanent physical injuries including, but not limited to, developing cardiovascular disease, strokes, myocardial infarcts, and other serious injuries, side effects, and death; notwithstanding Defendants' knowledge of an increased risk of these injuries and side effects over other forms of treatment for low testosterone. Thus, the subject product was unreasonably dangerous because an adequate warning was not provided as provided pursuant to La. R.S. 9:2800.57.

84.    The subject product manufactured and supplied by Defendants was defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of serious bodily harm from the use of the subject product, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the defects of the product, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings and instructions, or recall, while knowing that the product could cause serious injury and/or death.

85.    Bourgeois was prescribed and used the subject product for its intended purpose.

86.    Bourgeois could not have discovered any defect in the subject product through the exercise of reasonable care.

87.    Defendants, as manufacturers and/or distributors of the subject prescription product, are held to the level of knowledge of an expert in the field.

88.    Defendants, the manufacturers and/or distributors of the subject prescription product, are held to a level of knowledge of an expert in the field as the Reference Listed Drug

24

Company and the New Drug Application Holder.

89.     The warnings that were given by Defendants were not accurate, clear, and/or were ambiguous.

90.     The warnings that were given by Defendants failed to properly warn physicians of the increased risks of permanent physical injuries including, but not limited to, developing serious injuries, side effects and death.

91.     Bourgeois, individually and through his prescribing physician, reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

92.      Defendants had a continuing duty to warn Bourgeois of the dangers associated with the subject product.

93.     Had Bourgeois received adequate warnings regarding the risks of the subject product, he would not have used it.

D.     **FOURTH CAUSE OF ACTION: <u>Breach of Express Warranty under La. R.S. 9:2800.58</u>**

94.     Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if stated herein.

95.     Defendants expressly represented to Bourgeois, other consumers, and the medical community that AndroGel was safe and fit for its intended purposes, was of merchantable quality, did not produce any dangerous side effects, and had been adequately tested.

96.     AndroGel does not conform to Defendants' express representations because it is not safe, has numerous and serious side effects, and causes severe and permanent injuries, including, but not limited to, developing cardiovascular disease and other serious injuries and side effects.

97.    At the time of the making of the express warranties, Defendants knew, or in the exercise of reasonable care should have known, of the purpose for which the subject product was to be used and warranted the same to be, in all respects, fit, safe, and effective and proper for such purpose. The subject product was unreasonably dangerous because it failed to conform to an expressed warranty of Defendants as provided by La. R.S. 9:2800.58.

98.    At the time of the making of the express warranties, Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that the subject product was not safe and fit for its intended use and, in fact, produces serious injuries to the user.

99.    At all relevant times AndroGel did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

100.    Bourgeois, other consumers, and the medical community relied upon Defendants' express warranties.

E.    **FIFTH CAUSE OF ACTION: <u>Redhibition</u>**

101.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if stated herein.

102.    The subject product contains a vice or defect which renders it useless or its use so dangerous that buyers would not have purchased it.

103.    Defendants sold and promoted AndroGel, which Defendants placed into the stream of commerce. Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520. The subject product sold and promoted by Defendants, possesses a redhibitory defect because it was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which

renders the subject product useless or so inconvenient that it must be presumed that a buyer would not have bought the subject product had he known of the defect. Pursuant to La. C.C. art. 2520, Plaintiff is entitled to obtain a rescission of the sale of the subject product.

104.   The subject product alternatively possesses a redhibitory defect because the subject product was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which diminishes the value of the subject product so that it must be presumed that a buyer would still have bought it but for a lesser price. In this instance, Plaintiff is entitled to a reduction of the purchase price.

105. Defendants are liable as a bad faith seller for selling a defective product with knowledge of the defect, and thus, is liable to Plaintiff for the price of the subject product, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the subject product and attorneys' fees. As the manufacturer of the subject product, under Louisiana law, Defendants are deemed to know that AndroGel possessed a redhibitory defect. La. C.C. art. 2545.

    **F.**    **SIXTH CAUSE OF ACTION:<u>Breach of Warranty of Fitness for Ordinary Use</u>**

106.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if stated herein.

107.   In addition to warranting against redhibitory defects, Defendants warrant, as a matter of law, that the subject product is reasonably fit for its ordinary and intended use. La. C.C. art. 2524.

108.   The subject product is not safe, has numerous and serious side effects and causes severe and permanent injuries including, but not limited to, developing cardiovascular disease and other serious injuries and side effects. As a result, AndroGel is unfit and inherently

dangerous for ordinary use.

109.   As a direct and proximate result of Defendants' actions, Bourgeois required a heart stent to be inserted, developed blood clots and fluid in and around his lungs and other adverse health conditions.   Plaintiff, has and will sustain significant injuries, damages, and losses, including, but not limited to: medical and related expenses, loss of income, pain and suffering, diminished capacity for the enjoyment of life, and a diminished quality of life.

### G.   SEVENTH CAUSE OF ACTION: <u>Breach of Implied Warranty of Merchantability and Fitness</u>

110.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint as detailed above, with the same force and effect as if stated herein.

111.   At all relevant times, Defendants knew of the use for which AndroGel was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

112.   Defendants were aware that consumers, including Bourgeois, would use AndroGel for treatment or prevention of male hypogonadism/low testosterone.

113.   Bourgeois and the medical community reasonably relied upon the judgment and sensibility of Defendants to sell AndroGel only if it was indeed of merchantable quality and safe and fit for its intended use.

114.   Defendants breached the implied warranty to consumers, including Bourgeois, as AndroGel was not of merchantable quality or safe and fit for its intended use.

115.   Consumers, including Bourgeois and the medical community, reasonably relied upon Defendants' implied warranty for AndroGel.

116.   AndroGel reached consumers, including Bourgeois, without substantial change in the condition in which it was manufactured and sold by Defendants.

**H.      EIGHTH CAUSE OF ACTION: <u>Fraud</u>**

117.   Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if stated herein.

118.   Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed AndroGel until the present, willfully deceived Bourgeois and his family by concealing from them, Bourgeois's physicians, and the general public the true facts concerning AndroGel, which Defendants had a duty to disclose.

119.   At all times herein mentioned, Defendants, conducted a sales and marketing campaign to promote the sale of AndroGel and willfully deceive Bourgeois and his family, Plaintiff's physicians, and the general public as to the benefits, health risks and consequences of using AndroGel. Defendants knew of the foregoing, that AndroGel is not safe, fit, and effective for human consumption, that using AndroGel is hazardous to health, and that AndroGel has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Bourgeois suffered.

120.   Defendants concealed and suppressed the true facts concerning AndroGel with the intent to defraud, in that Defendants knew that Bourgeois's physicians would not prescribe AndroGel, and Bourgeois would not have used AndroGel, if they were aware of the true facts concerning its dangers.

121.   As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

**I.      NINTH CAUSE OF ACTION: <u>Negligent Misrepresentation</u>**

122.   Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if stated herein.

123.   From the time AndroGel was first tested, studied, researched, evaluated, endorsed,

manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Bourgeois and his family, Plaintiff's physicians, and the general public, including but not limited to the misrepresentation that AndroGel was safe, fit, and effective for human consumption. At all times mentioned, Defendants conducted a sale and marketing campaign to promote the sale of AndroGel and willfully deceive Bourgeois and his family, Plaintiff's physicians, and the general public as to the health risks and consequences of the use of the abovementioned product.

124.    Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

125.    The representations by the Defendants were in fact false, in that AndroGel is not safe, fit and effective for human consumption, using AndroGel is hazardous to health, and AndroGel has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Bourgeois.

126.    The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of AndroGel.

127.    In reliance of the misrepresentations by Defendants, and each of them, Bourgeois was induced to purchase and use AndroGel. If Bourgeois had known of the true facts and the facts concealed by Defendants, Bourgeois would not have used AndroGel. The reliance of Bourgeois upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

30

128.    As a result of the foregoing negligent misrepresentations by Defendants, Bourgeois suffered injuries as alleged herein.

## IV.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against Defendants as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff:

A.    General damages in an amount that will conform to proof at time of trial;

B.    Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C.    Loss of earnings and impaired earning capacity according to proof at the time of trial;

D.    Medical expenses, past and future, according to proof at the time of trial;

E.    For past and future mental and emotional distress, according to proof;

F.    Damages for loss of care, comfort, society, and companionship in an amount within the jurisdiction of this Court and according to proof;

G.    For punitive or exemplary damages according to proof;

H.    Restitution, disgorgement of profits, and other equitable relief;

I.    Injunctive relief;

J.    Attorney's fees;

K.    For costs of suit incurred herein;

L.    For pre-judgment interest as provided by law; and

M.    For such other and further relief as this Court may deem just and proper.

31

**V.     DEMAND FOR JURY TRIAL**

     Plaintiff is entitled to and hereby request a jury trial on all issues so triable in this action.


Dated: April 17, 2014                              Respectfully submitted,


                                   */s/* Russ M. Herman

                                   RUSS M. HERMAN (La Bar. No. 6819)

                                   MAURY A. HERMAN (La Bar. No. 6815)

                                   LEONARD A. DAVIS (La Bar. No. 14190)

                                   AARON Z. AHLQUIST (La Bar. No. 29063)

                                   **Herman, Herman & Katz, LLC**

                                   820 O'Keefe Avenue

                                   New Orleans, Louisiana 70113

                                   (504) 581-4892

                                   (504) 561-6024

                                   ***Attorneys for Plaintiffs***


                                   /s/ Dawn M. Barrios

                                   DAWN M. BARRIOS (#2821)

                                   BRUCE S. KINGSDORF (#7403)

                                   ZACHARY L. WOOL (#32778)

                                   **Barrios, Kingsdorf & Castiex,  L.L.P**

                                   701 Poydras Street, Suite 3650

                                   New Orleans, LA 70139-3650

                                   Telephone: (504) 524-3300

                                   Facsimile: (504) 524-3313

                                   ***Attorneys for Plaintiffs***